# EXHIBIT B

# TERM SHEET
# FINANCING FOR SERIES PROJECT ENTITLED
# "SHADOWPLAY" (EPISODES 101-108) ("Series")

This term sheet (the "Term Sheet") dated as of July 7, 2020, as amended on July 16, 2020 sets to writing the agreement by and between Creative Wealth Media Finance Corp., a Canadian corporation ("Creative") and Hudson Private LP ("Investor") with regard to the subject matter herein below. The parties may hereinafter be referred to individually as a "Party" or collectively as "Parties."

## RECITALS

WHEREAS, Shadowplay Series Holdings UK Limited, a company duly established and existing under the laws of England and Wales ("Borrower") entered into a term sheet dated as of January 15, 2019, and attached hereto as Schedule A (the "Term Sheet"), wherein Creative agreed to finance that certain Series entitled "Shadowplay (Episodes 101-108)" (the "Project");

AND WHEREAS, Creative, and Investor wish to enter an agreement through this Term Sheet wherein Investor agreed to advance a portion of Creative's financing obligations (the "Creative Financing") for the Project.

NOW THEREFORE, this Term Sheet is made by and between the Parties in consideration of the mutual undertakings, agreements and acknowledgements contained in this Term Sheet and for other good and valuable consideration the sufficiency and receipt of which each Party hereto acknowledges.

| Lender/Financier | Creative Wealth Media Finance Corp. (the "Creative"), wishes to obtain financing from Investor through a loan in connection with the production of the Project. |
|---|---|
| **Effective Date** | July 7, 2020 for $1,500,000 and July 16 for $1,500,000 |
| **Borrower** | Shadowplay Series Holdings UK Limited, a company duly established and existing under the laws of England and Wales with an office address at c/o Sheridans, 76 Wardour Street, London WIF OUR, UK ("Borrower") |
| Term: | The Investor shall be repaid the earlier of twelve (12) months from the "Delivery" of the final episode of the Series or December 31, 2021 ("Loan Maturity Date") |
| Loan: | Subject to satisfaction of certain conditions precedent, as more fully set forth below, Investor will advance a to Creative an amount of |

| | USD $3,000,000 (the "Loan"), to be used solely, other than for the Facilitation Fees, for production costs of the Series. |
|---|---|
| **Interest and Additional Interest** | The Investment will bear interest at a rate of 10% per annum (the "Interest"). Except as otherwise provided herein, all interest shall be payable in arrears.<br><br>Should repayment not come before the Loan Maturity Date, Parties agree that Investor shall be paid additional interest of 1.5% per month, commencing on the first business day of the next month, on the entire outstanding balance, until such time as all amounts due are fully repaid. |
| **Facilitation Fee** | Investor acknowledges that Borrower disbursed an amount equal to seven and one half percent (7.5%) of the Creative Financing (the "Facilitation Fees") to Creative. It should be noted that payment of the Facilitation Fees does not reduce any principal or interest payments due to Investor. the Facilitation Fee shall be used to pay the costs and expenses of the legal fees and administrative fees incurred in the administration, oversight and reporting of the performance of the Investment by Creative. |
| **Source of Repayment** | The Loan, inclusive of the Facilitation Fee, the Interest and the Net Profit Participation (defined below) shall all be recouped from gross receipts generated by the Project, if any, in accordance with the Collection Account Management Agreement ("CAMA"). |
| **Tandem Loan** | In order fully to finance the Approved Budget, Tandem shall provide a production loan from Tandem (the "Tandem Loan") against the value of the anticipated Film Incentive and the aggregate minimum guarantees payable under the Pre-Sale Agreements. The Tandem Loan shall be in an amount no less than €16,120,000.00. |
| **Budget** | The final net budget for the Project will not exceed €29,000,000.00. Investor shall not be responsible for any expenditures in excess of the budget, if any. |
| **Use of Investment:** | Proceeds of the Loan, less the Facilitation Fee, shall be used exclusively to finance the pre-production, production, post-production, and delivery of the Project. |
| **Allocation of Defined Gross Receipts** | Defined Gross Receipts, exclusive of all tax credit proceeds, as identified in the finance plan, used to repay the tax credit financier, shall be allocated as set forth in the CAMA attached as Schedule B. |

| **Copyright Owner** | The ownership of the copyright in the Series (including the copyright in the Approved Screenplay (as defined in Schedule A) and all subsidiary and derivative production rights therein shall be owned by the Borrower. |
|---|---|
| **Guarantor** | Studio Canal S.A. (the "Guarantor") |
| **Completion Agreement** | Borrower and Guarantor will cooperate with Lender to ensure completion agreement is in place that are satisfactory to Lender to ensure completion for the Series, which completion arrangements will require (a) Borrower's successful closing (to Lender's satisfaction) of all necessary financing for the Series; (b) Borrower's completion and provision of Lender's required completion guaranty documentation (in form approved by Lender ("**Completion Guaranty**"); and including without limitation; and (c) Lender's pre-approval inwriting of the following: |
| | 1. The final budget, cashflow and production schedule for the Series; |
| | 2. The final script; |
| | 3. Deferrals/holdbacks (if any); |
| | 4. Verification of third party development costs (all other development costs will not be acceptable for inclusion into the budget or recoupment in the waterfall until all financiers are repaid; |
| | 5. Key talent and producer(s) and director; |
| | 6. Production and Post Production services and facilities agreements; |
| | 7. Story rights, chain of title and writer's agreements; |
| | 8. A satisfactory pre-production meeting with the producers, director and key personnel; |
| | 9. Full insurance coverage, including Entertainment Package, Comprehensive General Liability and Errors & Omissions coverage, such coverage to be force prior to closing of the Completion Guaranty; |
| | 10. Borrower's undertaking that: (a) Borrower will cast to budget and limit the cast expenses to the amounts specified in the approved budget; (b) all unbudgeted delivery requirements or publicity costs will become a distribution charge; (c) the music, including all world clearances, will be obtained within the budgeted allowance; (d) Lender will bear no responsibility for legal fees, interest charges, bank |

| | |
|---|---|
| | charges or any other such charges in excess of the budgeted amounts; (e) Borrower will provide Lender with progress reports and cost statements, as required by Lender; (f) Borrower will provide Lender with all information it may require as to the status of deliveries; and (g) Lender will require a minimum 10% contingency included in the approved budget of the Series.<br><br>Borrower shall have three business days (24 hours during principal photography of the Series) from receipt of notice from Lender of failure to meet production requirements to satisfy Lender that it will meet its obligations under the approved completion arrangements. |
| **Net Profit Participation:** | Net Profits, shall be defined as set forth in the CAMA attached as Schedule B. 37.5% of twenty-five percent (25%) of Net Profits (as defined in the CAMA) due to Creative shall be allocated to Investor. |
| **Both Party Representations and Warranties:** | The Parties represent and warrant that: (a) each has the full right, power and authority to enter into and perform this Term Sheet; and (b) no Party has assigned, hypothecated, encumbered or otherwise transferred (or entered into an agreement to do any of the foregoing) any rights contemplated hereunder to any other party or person. Each Party further represents, warrants and agrees that it has the ability to fully perform all of its financial obligations hereunder, and that it shall do so in strict conformity with all applicable securities laws, regulations and treaties. |
| **Creative Representations and Warranties:** | a. There is no action, suit or proceeding (actual or threatened) at law or in equity or by or before any governmental instrumentality or other agency concerning the Project, or any investigation of the affairs concerning the Project in any respect.<br>b. Borrower owns all right, title and interest necessary to make, distribute, exhibit and otherwise exploit the Project throughout the universe.<br>c. The Project will be completed and delivered and will be technically acceptable to premium SVOD exhibitors and broadcasters U.S. and elsewhere.<br>d. Creative is in good standing under the laws governing it, and has the right and authority to enter into this Term Sheet and to grant the rights provided to Investor set forth herein |

| | |
|---|---|
| | e. Creative will notify Investor in writing if it sells the collateral (as defined in the Loan and Security Agreement) within 5 business days.<br>f. There shall be a completion guarantee in place with Studio Canal S.A. |
| **Investor Representations and Warranties** | a. Investor is an "Accredited Investor" as defined in OSC Rule 45-501.<br>b. Investor has relied on its own examination of the investment hereunder including, but not limited to, the Loan and Security Agreement and the merits and risks involved. Investor is aware that it may be required to bear the financial risks of this investment for an indefinite period of time. |
| **Conditions Precedent** | The commencement of this Term Sheet and all of Investor's obligations will be contingent on the following: (i) the satisfaction of diligence by Investor or its delegate and (ii) Creative shall provide a letter of instruction to a third party collection agent that Investor shall have access to view the collection account and receive all disbursements directly from the collection agent. |
| **Credits** | Credits: Provided Lender is not in breach of its obligations to Borrower under the Loan Agreement, subject always to the commissioning/pre-sale broadcasters' credit policies and guidelines, Lender will have the right to designate three (3) "Co-Executive Producer" credits for Lender's designees, of which: (i) one (1) shall be on a shared card (shared only with other co-producers) in the main titles of the Series (or, if there are no production credits at the beginning of the Series, in the end titles) in an average size of type and duration no less favorable than the average size of type and duration used to accord any other co- executive producer main title credit on the Series, and (ii) two (2) in the end roll in an average size of type and duration no less favorable than the average size of type and duration used to accord any other co- executive producer end roll credit on the Series; (collectively the "Lender Credits"). Subject always to the commissioning/pre-sale broadcasters' credit policies and guidelines, Lender shall also receive, in the same form and position as the screen credits, the main title co- executive producer Lender Credit in the billing block of all so called "paid ads", and its corporate "bug" logo on all paid ads of the Series issued by or under the Borrower's control including but not limited to, posters, home video packaging, soundtrack albums, "one-sheets", newspaper advertising, print advertising and any other advertising and promotional materials where any other co-executive producer or financier credits appear (subject to customary exclusions for |

| | |
|---|---|
| | honorary awards), including but not limited to Borrower's credits or a full billing block appears (the "Paid Ads") and any ancillary products (including packaging for DVDs, soundtracks, etc.) and one-sheets. For greater certainty, the font size and duration and all other aspects of the co-executive producer credits shall be no less favourable than those provided to any other "Co-Executive Producer" on the Series. |
| **Additional Standard Terms** | A long form agreement memorializing the term hereof, if any, shall include such terms as are standard in connection with investment agreements in the motion picture and television industries, including but not limited to: standard affirmative covenants such as ongoing financial reporting obligations from Creative, audit rights for Investor and notice of material changes, standard negative covenants, indemnification of Investor and remedies for breach. |
| **Information Rights** | Investor shall receive: (i) monthly reports from the CAMA within 20 calendar days of month-end; (ii) all reports and deliverables provided by Borrower to Creative within 5 business days or receipt and (iii) quarterly financial information about the Project directly from BRON Studios and/or the CAMA within 45 days of the end of the fiscal quarter. |
| **Confidentiality:** | The parties shall maintain at all times as confidential information the terms of this Term Sheet and the content of any negotiations between them, except that both parties may inform their respective advisors, regulatory authorities, counsel, lenders, or other equity holders and employees with a need to know as each party deems necessary (provided that all such persons are made aware of and agree to abide by the confidentiality hereof). |
| **Governing Law:** | This Term Sheet shall be governed by the laws of the State of New York and the laws of the United States applicable therein. In the event of a dispute arising hereunder, the prevailing party shall be entitled to recover its reasonable outside attorneys' fees and costs. |
| **Other:** | All terms of this Term Sheet shall be legally binding agreements of the parties hereto. |
| **Miscellaneous** | It is expressly agreed that this Term Sheet is an agreement between separate entities. The Parties each acknowledge that they are independent contractors and that solely by entering into this Term Sheet no partnership, joint venture, agency or employment relationship has or will be created by this Term Sheet. No Party hereto shall have the right or authority to create or |

|   | assume any obligations in any other Party's name or on any other Party's behalf, whether express or implied, or act or purport to act as any other Party's agent or legally empowered representative for any purpose whatsoever, without the other Party's prior written consent in each instance. No Party shall be liable to any third party in any way for any engagement, obligation, commitment, contract, representation, transaction, act or omission to act of the other Party(ies). |
|---|---|
|   | This Term Sheet contains the entire understanding of the Parties relating to its subject matter and supersedes and replaces all prior agreements and understandings, written or oral. No change or modification of this Term Sheet will be binding upon any Party unless it is made by a written instrument signed by all Parties. A waiver by any Party of any provision of this Term Sheet in any instance shall not be deemed to waive such provision for the future. This Term Sheet may be executed electronically and in counterparts, all of which together shall constitute a single Term Sheet. Signatures obtained via electronically transmitting a copy of this Term Sheet with an attached portable document file ("PDF") or electronically executed and thereafter sent by PDF shall be valid and enforceable as if signed by the that Party in person. |

Agreed and accepted as of the date written above.

**CREATIVE WEALTH MEDIA FINANCE CORP.**

By: _/s/ Jason Cloth_

Name: Jason Cloth


**HUDSON PRIVATE LP**

By: _/s/ Sandra M. Forman_

Name: Sandra M. Forman

Investment Term Sheet    7    Confidential
Shadowplay

Investment Term Sheet    7    Confidential
Shadowplay

## SCHEDULE A

## Distribution of Collected Gross Receipts

For the purposes of this Schedule A, definitions are as defined in the CAMA:

*Allocation and Distribution of Collected Gross Receipts*

The Collected Gross Receipts and Collection Account Interest shall be allocated and paid by CAM in the following manner and order (to the extent said amounts have not already been (partly) paid or repaid under this Exhibit A or any other sources, in which latter case the relevant Party shall as soon as reasonably possible notify this to CAM):

**1.** To CAM in payment of its CAM Fee and CAM Expenses; thereafter

**2.** In order to create a residuals reserve (the "Residuals Reserve") to pay all usual Residuals, if any, in connection with the distribution and exploitation of the Project, CAM shall retain 5% of the Collected Gross Receipts in the Collection Account (unless otherwise notified to the contrary in writing by the Master Distributor, with copies to all other Parties, whereby the CAM may rely on the accuracy of such notification(s)). Producer shall appoint a Payroll House to calculate on a semi-annual basis the exact amount of Residuals due on the basis of a semi-annual notice to the Payroll House by CAM about the Collected Gross Receipts generated during the applicable Accounting Period and shall have CAM copied on the resulting invoices from the Payroll House to Producer, whereby CAM may rely on the accuracy of such invoices. Subsequently CAM shall pay such invoiced amount to the Payroll House for payment of Residuals. Any excess residuals reserve shall be liquidated no less than annually in accordance with the remainder of this Exhibit A. Provided that **Mans Marlind / Björn Stein are each entitled to a contingent compensation of 0.625% of Collected Gross Receipts, as further detailed under Exhibit A-1. Such contingent compensation shall be paid from the Residuals Reserve**; thereafter

**3. Depending on where the Collected Gross Receipts are derived from:**

    **A.** **Out of Master Distributor Domestic Receipts only,** on a pari passu basis as follows:
        **i.** To the Master Distributor in payment of the Master Distributor Domestic Commission; and
        **ii.** To the Producer in payment of the Bron Fee;
    **B.** **Out of Master Distributor ROW Receipts only,** to the Master Distributor in payment of the Master Distributor ROW Commission;
    **C.** **Out of Ancillary Rights Domestic Receipts only,** on a pro rata, pari passu basis as follows:
        **i.** To the Master Distributor in payment of the Master Distributor Ancillary Domestic Fee; and

  **ii.** To the Producer in payment of the Bron Ancillary Rights Domestic Fee;
**D. Out of Ancillary Rights ROW Receipts only,**
  **i.** If applicable, to the Master Distributor in payment of the Master Distributor Ancillary ROW Fee; or
  **ii.** If applicable, to the Producer in payment of the Bron Ancillary Rights ROW Fee;

thereafter

**4.** To Master Distributor in payment of the Master Distributor Expenses; thereafter

**5.** To Lender in repayment of the BRON Financing; thereafter

**6.** To Master Distributor in payment of the Additional Purchase Price, if any; thereafter

**7.** If applicable, to the applicable third-party Beneficiary in payment of the Deferred Agency Packaging Fee; thereafter

**8.** If applicable, to the applicable third-party Beneficiary(ies) in payment of the Domestic Sale Bonus(es) as outlined in Exhibit A-1; thereafter

**9.** To Master Distributor in payment of the Pre-Sales Commission; thereafter

**10.** To the Guarantor in repayment of the Guarantor Advances, if any; thereafter

**11.** The remainder shall be considered net profits ("Net Profits"), which shall be allocated and paid on a pro rata, pari passu basis as follows:

 **A.** To the applicable third-party Beneficiaries as detailed in Exhibit A-1; and
 **B.** The remainder shall be allocated between the Producer and Master Distributor in equal shares save that Producer's share of the Net Profits shall not be less than 40% of 100% of the Net Profits (i.e.; any third party Beneficiaries' Share in excess of 60% of the Net Profits shall proportionally reduce the Master Distributor's Share of the Net Profits hereunder).