UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

HUDSON PRIVATE LP,

              Plaintiff,

v.

CREATIVE WEALTH MEDIA FINANCE CORP.,

             Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Case No. 22-cv-05520-PAE

**DECLARATION OF JASON CLOTH**

I, Jason Cloth, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am a managing partner of defendant Creative Wealth Media Finance Corp. ("Creative Wealth"). The information in this declaration is based upon my personal knowledge and/or the books and records of Creative Wealth.

2. It is my understanding that the plaintiff in this action, Hudson Private LP ("Hudson"), is seeking judgment against Creative Wealth pursuant to the terms of an Amended and Restated Promissory Note dated July 6, 2020 and July 16, 2020 ("Note") that Creative Wealth gave to Hudson in connection with $3,000,000 in funds that Hudson advanced to Creative Wealth to finance a television series called "Shadowplay."

3. But while the Note provides that those funds plus interest would be due and payable by the earlier of (1) twelve months after "delivery" of the final episode of the show; or (ii) December 31, 2021, Creative Wealth was not required to repay any amount to Hudson unless Shadowplay generated sufficient gross receipts to repay Hudson's financing.

4. That is because Creative Wealth and Hudson entered into three agreements—not just the Note—which relate to the financing of Shadowplay: (1) a Loan and Security Agreement ("LSA"), dated as of July 7, 2020, a true and copy of which is attached hereto as Exhibit A; (ii) the

Note; and (iii) a document titled, Term Sheet Financing For Series Project Entitled "Shadowplay" (Episodes 101-108) ("Series")), dated as of July 7, 2020, as amended on July 16, 2020 (the "Term Sheet"), a true and copy of which is attached hereto as Exhibit B.

5. The LSA states that the Note and Term Sheet "are attached to this Agreement and form an integral part hereof." *See* LSA at p. 1.

6. The Term Sheet memorialized that Creative Wealth and a non-party, Shadowplay Series Holdings UK Limited, previously entered into an agreement under which Creative Wealth agreed to finance the production of Shadowplay[1] and that Hudson would be advancing $3,000,000 to Creative Wealth to partially fund Creative Wealth's financing obligations. *See* Ex. B at p. 1.

7. Importantly, the Term Sheet provides that the source of repayment of Hudson's $3,000,000 advance to Creative Wealth—which the Term Sheet refers to as the "Loan"—along with interest and other amounts, would be from the gross receipts of the Shadowplay project in accordance with a payment waterfall set forth in a separate Collection Account Management Agreement ("CAMA") pursuant to which various parties were to be paid out of the gross receipts from the Shadowplay project:

| **Source of Repayment** | The Loan, inclusive of the Facilitation Fee, the Interest and the Net Profit Participation (defined below) shall all be recouped from gross receipts generated by the Project, if any, in accordance with the Collection Account Management Agreement ("CAMA"). |
|---|---|

*Id.* at p. 2.[2]

8. A CAMA is an account set up in the name of a neutral third-party collection account

---

[1] A true and correct copy of the agreement between Creative Wealth and Shadowplay Series Holdings UK Limited is attached hereto as Exhibit C.

[2] The waterfall set forth in the CAMA is included as Schedule A to the Term Sheet. *See* Ex. B, at p. 8.

2

manager who receives and distributes the revenues generated from the exploitation of a production.

9. Therefore, it was my understanding that there were no amounts repayable to Hudson by Creative Wealth or anyone else unless Shadowplay generated sufficient gross receipts to repay the Hudson Loan.

10. In fact, Hudson even acknowledged in the Term Sheet that its investment involved the risk that it would not be repaid. It represented and warranted that it "has relied on its own examination of the investment hereunder including, but not limited to, the Loan and Security Agreement and the merits and risks involved. [Hudson] is aware that it may be required to bear the financial risks of this investment for **an indefinite period of time**." *See* Ex. B at p. 5 (emphasis added).

11. Unfortunately, the project was not as successful as Creative Wealth had hoped, and Shadowplay did not generate sufficient gross receipts to repay Hudson. Therefore, no amount is due and owing to Hudson, from Creative Wealth or anyone else.

12. Finally, it is my understanding that Hudson has filed with the Court an audit letter that Hudson claims I signed, which states that Hudson loaned $3,000,000 to Creative Wealth at an interest rate of 10%, and that the loan would mature on December 31, 2021.

13. Although I do not specifically recall signing the letter, it appears that the purpose of the letter—which was on Hudson's letterhead—was merely to confirm to Hudson's auditors the amount of outstanding principal and interest as of December 31, 2020, and not that Creative Wealth was liable to repay the Loan. As stated above, repayment of those outstanding amounts was conditioned on Shadowplay's generation of sufficient gross receipts.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 16, 2022

JASON CLOTH