# EXHIBIT C

**TERM SHEET**

**FINANCING FOR TELEVISION SERIES PROJECT ENTITLED**
**"Shadowplay (Episodes 101-108)"** ("Series")

| | |
|---|---|
| **Effective Date:** | January 15, 2019 |
| **Lender:** | Creative Wealth Media Finance Corp. (the "**Lender**"). |
| **Borrower:** | SHADOWPLAY SERIES HOLDINGS UK LIMITED, a company duly established and existing under the laws of England and Wales with an office address at c/o Sheridans, 76 Wardour Street, London W1F 0UR, UK  (the "**Borrower**") wishes to obtain financing from Lender in connection with the production of the Series in accordance with the specifications attached hereto at Schedule "A". |
| **Copyright Owner:** | One half of the ownership of the copyright in the Series (including the copyright in the Approved Teleplay (as defined in Schedule "A") and all subsidiary and derivative production rights therein shall be owned by the Borrower. |
| **Completion Guarantor:** | Studio Canal S.A.. (the "**Completion Guarantor**") |
| **Loan Guaranty and Completion Arrangements:** | Completion Guarantor shall guarantee the Borrower's delivery requirements under the sales agency/distribution agreement(s) for the Series and shall provide any required completion funds, if any, in accordance with the terms of a completion agreement to be entered into by Borrower and Lender in a form approved by Lender. |
| | Borrower and Completion Guarantor will cooperate with Lender to ensure completion agreement is in place that is satisfactory to Lender to ensure completion for the Series, which completion arrangements will require (a) Borrower's successful closing (to Lender's satisfaction) of all necessary financing for the Series; (b) Borrower's completion and provision of Lender's required completion guaranty documentation (in form approved by Lender ("**Completion Guaranty**"); and including without limitation; and (c) Lender's pre-approval in writing of the following: |
| | 1.    The final budget, cashflow and production schedule for the Series; |
| | 2.    The final teleplay; |
| | 3.    Deferrals/holdbacks (if any); |

| | |
|---|---|
| | 4. Verification of third party development costs (all other development costs will not be acceptable for inclusion into the budget or recoupment in the waterfall until all financiers are repaid; |
| | 5. Key talent and producer(s) and director; |
| | 6. Production and Post Production services and facilities agreements; |
| | 7. Story rights, chain of title and writer's agreements; |
| | 8. A satisfactory pre-production meeting with the producers; |
| | 9. Full insurance coverage, including Entertainment Package, Comprehensive General Liability and Errors & Omissions coverage, such coverage to be force prior to closing of the Completion Guaranty; |
| | 10. Borrower's undertaking that: (a) Borrower will cast to budget and limit the cast expenses to the amounts specified in the approved budget; (b) all unbudgeted delivery requirements or publicity costs will become a distribution charge; (c) the music, including all world clearances, will be obtained within the budgeted allowance; (d) Lender will bear no responsibility for legal fees (other than Lender's own legal fees incurred in the negotiation of the Loan Documents), interest charges, bank charges or any other such charges in excess of the budgeted amounts; (e) Borrower will provide Lender with progress reports and cost statements, as required by Lender; (f) Borrower will provide Lender with all information it may require as to the status of deliveries; and (g) Lender will require a minimum 10% contingency included in the approved budget of the Series. |
| | 11. Borrower shall have three business days (24 hours during principal photography of the Series) from receipt of notice from Lender of failure to meet production requirements to satisfy Lender that it will meet its obligations under the approved completion arrangements. |
| **Loan:** | Subject to satisfaction of the Series Specifications set forth in Schedule "A" which are capable of being satisfied prior to commencement of principal photography of the Series and subject to satisfaction of all Conditions Precedent (defined herein) and such other conditions precedent as set forth in the loan and security agreement ("**Loan Agreement**") between Lender and Borrower in respect of the Series, Lender will advance a loan of up to a total amount of Thirteen Million Eight Hundred Forty-Six Thousand Euros **€13,846,000.00** (the "**Loan**") to be used solely for production costs of |

| | the Series.  The Loan is inclusive of the Loan Fee and Legal Fees (defined below). |
|---|---|
| **Interest:** | The Loan will bear interest on so much of the outstanding amount thereof as may remain unpaid from time to time at the rate of ten percent (10%) per annum, compounded annually (the "**Interest**"), on the total of the Loan calculated on a going-forward basis from the date of the Initial Disbursement until payment in full has been received by Lender. Except as otherwise provided herein, all interest shall be payable in arrears. |
| **Maturity:** | The Loan shall have a maturity date that is twenty four (24) months from the "Delivery" of the final episode of the Series (the "**Loan Maturity Date**"). |
| **Loan Fee:** | Borrower shall pay to Lender a non-refundable commitment and set up fee in an amount of seven and one half percent (7.5%) of the net amount of Loan (being €12,880,000) (the "**Loan Fee**"), which is currently estimated to be **€966,000.00**. The Loan Fee shall be used by Lender to pay all costs and expenses of Lender in connection with this Term Sheet, the Loan Agreement and other Closing Documents, including any legal fees incurred by Lender's counsel in connection with this Term Sheet, the Loan Agreement and the Closing Documents.  The Loan Fee shall be earned in full by Lender upon the Initial Disbursement (as hereafter defined) under the Loan.  The Loan Fee shall be paid to Lender by deducting one hundred percent (100%) of the Loan Fee from the Initial Disbursement payable to Borrower hereunder or deducted pro rata from each Disbursement, at Lender's election.  The Lender and Borrower agree that Loan Fee shall not be included in the Approved Budget. |
| **Escrow, Availability and Closing:** | Upon satisfaction of all the Conditions Precedent hereunder the Loan will be advanced to the Borrower to the designated production account set forth in the Loan Agreement ("**Production Account**") in accordance with a cash flow schedule pre-approved in writing by Lender and Borrower. |
| **Tandem Loan:** | In order fully to finance the Approved Budget, Tandem Production GmbH ("**Tandem**") shall provide a production loan (the "**Tandem Loan**") against the value of the anticipated tax credit receipts the ("**Film Incentive**") and a discounted value of the aggregate minimum guarantees payable under the distribution agreements secured as of the date hereof the ("**Pre-Sale Agreements**").  The Tandem Loan shall be in an amount no less than **€16,120,000.00**. |

| | |
|---|---|
| **Approved Budget:** | The final locked budgets for the Series shall not exceed **€$29,000,000.00** without Lender's prior written approval.  The budget of the Series, once approved by Lender, Completion Guarantor and Borrower will be the "**Approved Budget**". |
| **Deferred Fees Contingency etc.:** | Lender will require a minimum 2.5% contingency included in the approved budget of the Series. |
| **Use of Proceeds:** | Proceeds of the Loan, less the Loan Fee, shall be used exclusively to finance the pre-production, production, post-production, and delivery of the Series. |
| **Security:** | The Borrower hereby agrees that the obligations of Borrower to Lender with respect to the Loan described herein shall be secured by, and each of them hereby grant to Lender a security interest, in first priority position, in and to all of Borrower's assets, including, without limitation, Borrower's respective right, title and interest in or relating to the Series, and all of Borrower's (and any of their respective affiliates') right, title and interest in any of the revenue arising out of or relating to the Series, including, without limitation, the Completion Guaranty and insurance policy issued in connection with the Series and all tax and other incentives and so-called "soft monies" in connection with the Series, all as set forth in greater detail in the security documentation being entered into contemporaneously herewith, which security documentation will include a copyright mortgage and general security agreement (the "**Collateral**"). In addition to the related security documentation to be entered into contemporaneously herewith, Lender shall be entitled to file one or more financing statements in all applicable jurisdictions in order to perfect its security interest in the Collateral. |
| **Subordination:** | Notwithstanding the foregoing, Lender acknowledges and agrees that Lender shall <u>subordinate</u> its security interest to the security interest of any applicable guilds (if required by such guilds) and in Film Incentives and Pre-Sale Agreements that are interim financed by Tandem and required to repay in accordance with the Tandem Loan subject to the terms of a mutually agreeable form of interparty agreement ("**Interparty Agreement**") to be entered into between, among others, Lender, and Tandem dealing with priority of recoupment as set forth in the "Priority" section below. |
| **Priority:** | Subject to the limited subordination in favor of the Film Incentives and Pre-Sale Agreements in respect of the Tandem Loan and in accordance with the Interparty Agreement, Lender will be entitled to recoup the Loan, plus interest and charges from all gross receipts |

| | derived from exploitation of the Series and ancillary rights worldwide, all as set forth in the mutually agreed Interparty Agreement. |
|---|---|
| **Sales Agents / Distribution:** | Lender will be entitled to pre-approve in writing: <br><br>(a)    domestic and foreign sales agents; <br><br>(b)    maximum sales agent commissions; <br><br>(c)    maximum in marketing/sales expenses; and <br><br>(d)    domestic and foreign sales and distribution agreements. |
| **Approvals:** | Lender will have customary approval rights, which shall be outlined in the Loan Agreement, Completion Guaranty and shall include, without limitation, approvals over the: <br><br>1.   Approved Teleplay. <br><br>2.   Finance Structure. <br><br>3.   Budget. <br><br>4.   Cash Flow. <br><br>5.   Production and Post-Production Schedules. <br><br>6.   Distribution agreements. <br><br>7.   International and Domestic Sales Company (where StudioCanal is pre-approved). <br><br>8.   Key Cast and Crew. <br><br>9.   Cast/Composer deferment agreements. <br><br>10. All contingent compensation payable to director, lead cast, other cast, writers, producers, executive producers and all other "talent" (including deferments, bonuses and participations). |
| **Collection Account:** | All revenues derived from exploitation of the Series will be paid into a collection account administered by a collection account manager approved in writing by Lender (Fintage is hereby pre-approved). Lender shall be a named party to the Collection Account Management Agreement (the "**CAMA**") and all amounts payable to Lender hereunder will be payable to Lender in accordance the terms and instructions of the CAMA in a form to be approved in writing by Lender. |
| **Net Profit Participation:** | In further consideration of Lender's agreement to advance the Loan in accordance with the terms hereof, Lender shall receive an amount equal to 25% of 100% of Borrower's "Net Profits", the definition of which shall be defined and approved by Lender in writing in the |

| | |
|---|---|
| | CAMA for the Series (such definition shall be no less favourable to Lender than the definition accorded to any other participant in the Series' "**Net Profits**"). |
| **Financing Documents:** | The following documents, and all others required by Lender at its discretion, shall constitute the "**Financing Documents**" required as conditions precedent to be satisfied (as determined by Lender in its sole discretion) prior to any advances under the Loan, it being agreed that the Loan shall be funded upon satisfaction of the Conditions Precedents specifically defined in the Loan Agreement: <br><br> 1. Loan and Security Agreement. <br> 2. Loan Guaranty. <br> 3. Completion Guaranty. <br> 4. Promissory Note. <br> 5. Borrowing Certificate. <br> 6. Power of Attorney. <br> 7. Deposit Account Control Agreement (if necessary). <br> 8. Escrow Agreement (if necessary). <br> 9. Interparty Agreement. <br> 10. Copyright Mortgages. <br> 11. General Security Agreements. <br> 12. CAMA. <br> 13. PPSA and UCC Financing Statements and authorizations. <br> 14. Lab Pledgeholder Agreements. <br> 15. All other documents referred to in the Loan Agreement and any other documents as required by Lender. |
| **Credits:** | Provided Lender is not in breach of its obligations to Borrower under the Loan Agreement, subject always to the commissioning/pre-sale broadcasters' credit policies and guidelines, Lender will have the right to designate three (3) "Co-Executive Producer" credits for Lender's designees, of which: (i) one (1) shall be on a shared card (shared only with other co-producers) in the main titles of the Series (or, if there are no production credits at the beginning of the Series, in the end titles) in an average size of type and duration no less favorable than the average size of type and duration used to accord any other co-executive producer main title credit on the Series, and (ii) two (2) in the end roll in an average size of type and duration no less favorable than the average size of type and duration used to accord any other co- |

| | executive producer end roll credit on the Series; (collectively the "**Lender Credits**"). Subject always to the commissioning/pre-sale broadcasters' credit policies and guidelines, Lender shall also receive, in the same form and position as the screen credits, the main title co-executive producer Lender Credit in the billing block of all so called "paid ads", and its corporate "bug" logo on all paid ads of the Series issued by or under the Borrower's control including but not limited to, posters, home video packaging, soundtrack albums, "one-sheets", newspaper advertising, print advertising and any other advertising and promotional materials where any other co-executive producer or financier credits appear (subject to customary exclusions for honorary awards), including but not limited to Borrower's credits or a full billing block appears (the "**Paid Ads**") and any ancillary products (including packaging for DVDs, soundtracks, etc.) and one-sheets. For greater certainty, the font size and duration and all other aspects of the co-executive producer credits shall be no less favourable than those provided to any other "Co-Executive Producer" on the Series. |
|---|---|
| **Premiere:** | Borrower shall procure Lender six (6) complementary invitations to all premieres of the Series in Canada and the United States of America (at Lender's discretion), if any. |
| **Covenants and Representations and Warranties:** | (a) There is no action, suit or proceeding (actual or threatened) at law or in equity or by or before any governmental instrumentality or other agency concerning the Series, or any investigation of the affairs concerning the Series or the Collateral in any respect. <br><br> (b) Borrower owns (or will own upon the existence of each of the following) one half of all right, title and interest, in and to the Collateral including all right, title and interest necessary to make, distribute, exhibit and otherwise exploit the Series throughout the universe. <br><br> (c) No material or matter used in or in connection with the Series will infringe any copyrights, statutory or common law, or violate the rights of any third party. <br><br> (d) The Series will be completed and delivered and will be technically acceptable to exhibition in first class theatres in the U.S. and elsewhere. <br><br> (e) Borrower is a duly constituted, registered and organized company and is in good standing under the laws governing it, and has the right and authority to enter into this Term Sheet and to grant the rights provided to Lender set forth herein and in the related Financing Documents. |

| Conditions Precedent: | The long form Loan Agreement shall outline the complete set of conditions precedent ("**Conditions Precedent**") which shall include, but are not limited to: |
|---|---|
| | (a) Chain of Title. Chain of title, including proof of payment and a legal opinion, copyright registrations, in form and substance approved by Lender in its sole discretion, for the Teleplay and the Series, which provides that, the copyright and distribution rights are held in the name of Borrower. |
| | (b) Financing/Security Documents. Financing Documents and such other security documents as may be reasonably required by Lender, being fully executed (and notarized, if applicable) and unconditionally delivered to Lender. |
| | (c) Corporate Documentation. The articles of incorporation, shareholder agreements, resolutions and all other organizational documentation of Borrower and qualifications of Borrower qualified to do business under applicable law, including, without limitation, any foreign qualifications to do business as may be required and a corporate legal opinion in a form satisfactory to Lender. |
| | (d) Key Cast and Crew Agreements. All agreements (or confirmed and agreed to material deal terms) for key cast, key crew (including director, director of photography, Producers, production designer, composer and editor). |
| | (e) E&O and Production Insurance Policies. Insurance policies with endorsements in favour of Lender as an additional insured. Borrower represents and confirms that that there are no "essential elements". |
| | (f) Proof of Financing. Binding financing agreement between Borrower and other financiers, in a form acceptable to Lender evidencing that the Approved Budget is fully financed and that such financing has been advanced into the Escrow Account pursuant to the Escrow Agreement. |
| | (g) Finance Plan. Approved Budget and, if applicable, satisfaction of the "Strike Price" under the Completion Guaranty, including, without limitation, (a) Tax Credit Financier's legally binding commitment to advance the Tandem Loan, other equity financiers' legally binding commitment to advance the amounts set forth in the finance plan to be approved in writing by Lender, all to be used exclusively to fund Series related expenses as set forth in the Approved Budget and secured (e.g., letter of credit, escrow, pre-funded, etc.) to the satisfaction of Lender. |

| | |
|---|---|
| | (h) <u>Sales Agent Agreement/Estimates</u>.  Agreements with approved foreign and domestic sales agents, including sales estimates.<br><br>(i) <u>Other Conditions</u>.  Such other conditions precedent required by Lender and as are customary for transactions of this nature. |
| **Loan Agreement and Termination:** | Lender and Borrower intend to enter into a Loan Agreement (as defined herein) incorporating the terms of this Term Sheet as well as Lender's Additional Standard Terms.  The terms and conditions entered into in the Loan Agreement shall replace and supersede this Term Sheet. In the event that the Loan Agreement has not been entered into or the Conditions Precedent are not completed to Lender's satisfaction on or before August 31, 2019, Lender shall have no obligation to Borrower hereunder and this Term Sheet will be automatically terminated and of no force or effect.  In the event that Lender elects in its sole discretion to advance any amount of the Loan to Borrower prior to the satisfaction of the Conditions Precedent or execution of the Loan Agreement, then such amounts will accrue interest in accordance with this Term Sheet and become immediately due and payable to Lender if this Term Sheet is terminated prior to the satisfaction of the Conditions Precedent. |
| **Post-Production and Underages:** | <u>Post-Production</u>: The benefit of any post-production deals which may include in-kind or equity investments shall reduce the final negative cost of the Series.<br><br><u>Underbudget Savings</u>: Any savings from the Approved Budget shall be paid to Lender in proportion to its Loan financing provided in respect of the Series.  Notwithstanding the preceding, in the event of a conflict between this paragraph and the provisions of an interparty or intercreditor between Lender, Borrower and other financiers, the terms of the interparty or intercreditor shall control. |
| **Additional Standard Terms:** | The Loan Agreement shall include such terms as are standard in connection with senior lender agreements in the film industry, including but not limited to: standard affirmative covenants such as ongoing financial reporting obligations of Borrower, audit rights for Lender and notice of material changes, standard negative covenants, indemnification of Lender and remedies for events of default by Borrower. |
| **Confidentiality:** | The parties shall maintain at all times as confidential information the terms of this Term Sheet and the content of any negotiations between them, except that both parties may inform their respective advisors, regulatory authorities, counsel, lenders, or other equity holders, financiers and employees with a need to know as each party deems |

|  | necessary (provided that all such persons are made aware of and agree to abide by the confidentiality hereof). |
|---|---|
| **Governing Law:** | This Term Sheet will be governed by the laws of the State of New York. |
| **Other:** | All terms of this Term Sheet shall be legally binding agreements of the parties hereto. |
| **Counterparts:** | This Term Sheet may be executed in one or more counterparts and via electronic transmission or electronic execution, each of which shall constitute an original hereof and which together shall constitute one agreement. |

[The remainder of this page is intentionally left blank]

Agreed and accepted and executed by the parties on this 15th day of January, 2019 to be effective as of the Effective Date.

**Creative Wealth Media Finance Corp.**

By: _____

Name: Jason Cloth

Title:   Authorized Signing Officer

**SHADOWPLAY SERIES HOLDING UK LIMITED, LLC**

By: _____

Name: Steven Thibault

Title:   Authorized Signing Officer

By: _____

Name: Aaron Gilbert

Title:   Authorized Signing Office

## SCHEDULE "A"

## Series Specifications

## "SHADOWPLAY"

The Series shall be directed by Mars Marlind ("**Director**"), shall be produced as a live action television series Series production by Shadowplay Series Holdings UK Limited ( the, "**Producer**"), starring Taylor Kitsch and Michael C. Hall and shall consist of eight (8) one (1) hour episodes with each episode having a  running time in accordance with the broadcaster requirements, shall be based on and substantially conform to the eight (8) approved teleplay written by Mans Marlind (the "**Approved Teleplay**"), subject to minor changes occasioned by the contingencies of production which do not materially alter characters or narrative, and shall be produced in accordance with the approved production budget (the "**Approved Budget**"), subject to minor variations within budget categories, and the approved production cash-flow schedule ("the "**Approved Cash Flow**") and the approved production schedule (the "**Approved Schedule**"), subject to deviations from the Approved Cash Flow and the Approved Schedule approved by Producer and Creative Wealth Media Finance Corp. (the "**Lender**").  Producer shall obtain customary errors and omissions and general production insurance ("**Customary Insurance**").

### Approved Budget

The Approved Budget shall not exceed **€$29,000,000.00** without Lender's prior written approval. The Approved Budget shall be inclusive of all direct development and production costs, the Lender's fee and required customary contingency and an allowance for all delivery items (including delivery items bonded by the Completion Guarantor) (i) customarily required by U.S. "major" distributors for the domestic territory (the "**Domestic Territory**"); and (ii) customarily required by first-class international sales agents who represent U.S. based producers ("**Sales Agent**") in connection with licensing theatrical motion Series for the "International Territory" (i.e., the world excluding the Domestic Territory), a producer fee in the amount not to exceed the amount set forth in the Approved Budget for Producer (the "**Producer Fee**"), and the premiums for Customary Insurance.  Neither Producer (nor any of its affiliates or the principals or employees of any of the foregoing) shall be entitled to any other payment out of the Approved Budget (whether denominated a fee or overhead or otherwise).  Neither Tax Credit Financier (nor any of its affiliates or the principals or employees of any of the foregoing) shall be entitled to any repayments on its financing (however denominated) out of the Approved Budget.  Neither director nor any entity furnishing services or assigning rights (nor any of its affiliates or the principals or employees of any of the foregoing) shall be entitled to receive any payments (however denominated) out of the Approved Budget in excess of the amounts set forth in the Approved Budget.  No person or entity shall be entitled to receive a producer or executive producer or similar fee out of the Approved Budget (other than the Producer Fee) without the Lender's prior written approval.  The Approved Budget shall include all amounts necessary to effect delivery in accordance with the foregoing schedules (each of which shall be subject to alteration once the Domestic Distributor and the Sales Agent have been determined.